*668 OPINION OF THE COURT
Alan C. Marin, J.
This is the decision following the liability trial of Jeanette Perez’s claim against the State of New York that while incarcerated in Bayview Correctional Facility, Correction Officer Peter Zawislak had sex with her on multiple occasions. Sexual encounters between a correction officer and an inmate cannot be consensual (Penal Law § 130.05 [3] [e]).
The parties do not dispute that sex between the two occurred.[1] Officer Zawislak pleaded guilty to rape in the third degree and was sentenced to one to three years’ imprisonment (claimant’s exhibit 6). Further, Ms. Perez gave birth to a son on October 15, 2001, and Mr. Zawislak acknowledged that he was the father. The case here turns on what the facility administration could have done to prevent the statutory, nonconsensual sexual encounters.
Bayview is a seven-story medium security facility located at 550 West 20th Street in Manhattan. There were inmate housing units or dorms on floors 3, 5, 6 and 7; the third-floor unit was an honor dorm classified as minimum security. The facility also had an annex for work-release inmates.
Mr. Zawislak became a correction officer in 1996; his first assignment was at Sing Sing, after which he was transferred to Bedford Hills Correctional Facility, a maximum security women’s prison where he met Perez. The two had no sexual relationship at Bedford Hills; Zawislak testified that “we talked a lot, and that was about it.” The officer transferred to Bayview in December of 1998, which was about the same time that Perez arrived there.
At Bayview, Ms. Perez, who was serving a term of 6 to 12 years for armed robbery, was initially placed in a regular dorm on the sixth floor that housed about 50 inmates. At the beginning of 1999, Perez was moved to the honor dorm. The honor dorm at the time housed about 10 to 12 inmates in rooms, not cells, one inmate to a room.[2] Each room had a door containing a window with a curtain. The inmate could keep the door open or shut, but the curtain could only be pulled over the window when *669 the inmate was dressing. The rooms line two corridors that meet in a corner where the officer’s station is situated.
The third floor also had a law library and a gym. According to the testimony of Kenneth Werbacher, Bayview’s deputy superintendent for security, the library’s hours were about 2:00 p.m. to 8:00 p.m., and it did not have an officer assigned there when open, and the gym was open from 3:00 p.m. to about 9:00 or 10:00 p.m. and was staffed with an officer. The gym officer could escort inmates up to the roof for an hour or so of exercise and fresh air. The roof is reached by taking an elevator to the 7th floor and then a flight of stairs.
Deputy Superintendent Werbacher explained that the third floor had an officer assigned for the second and third shifts, 3:00 p.m. to 11:00 pm. and 11:00 p.m. to 7:00 a.m., but not for the day shift because the inmates were out of the dorm at their jobs. However, such assigned officer on the honor dorm was, Werbacher testified, “what they call a contingency post; meaning that, if the officer was needed for something somewhere else, they could take him off that floor and leave it unmanned. That was the only housing unit like that.”
Zawislak testified that at Bayview, he had held the posts of roundsman, gym officer and honor floor officer (the contingent post). Werbacher described a roundsman’s duties as, “responsible for random patrols around the facility, who also picks up count slips at count times, and responds to emergencies.” The deputy superintendent agreed that the roundsman had a set of keys and, “almost full range of the facility,” and was not subject to increased supervision.
Zawislak added that his duties as roundsman at Bayview also included noninmate related chores such as gassing up the vehicles or collecting garbage at the end of the shift, which he would be directed to do by radio. It was as a roundsman that he first had sex with Perez late in the summer of 1999 and as a roundsman in March of 2001, that Zawislak was found trying to hide in Perez’s room under her bunk or bed.
Training
Zawislak testified that at Bayview he had attended an in-service training course on working with female offenders, at which the correction officers in attendance were told that sexual contact in any form was illegal. Claimant’s exhibit 3 is a form that was signed by Zawislak on May 5, 1999, in which he affirmed that he had attended, “the in-service training on work *670 ing with female offenders,” and that he had, “been informed of NY Penal Law 130.05, that it is a felony in New York State to engage in sexual activity with an inmate.”
In addition to the scheduled training sessions, Deputy Werbacher testified that there were reminders, from time to time, at the beginning of shift lineups: “don’t get involved.” In addition, according to the deputy superintendent, he would on a quarterly basis give a speech to all shifts, “don’t have sex with the inmates”; the correction officers were told that sex with an inmate was a class E felony, and that they could do jail time.
A printout of the training courses taken by Zawislak lists an April 7, 1999 two-hour course, Sexual Harassment; the May 5, 1999 course, The Female Offender (four hours); an October 14, 1999 four-hour course, Inappropriate Behavior; and a June 20, 2000 four-hour course on sexual harassment. The last course (and probably the October 14, 1999 one) were given after Zawislak and Perez had begun having sex. (Defendant’s exhibit C.) (See the 20-page course outlines entitled “Avoiding Inappropriate Behavior Between Staff and Inmates and Working with Female Offenders” [defendant’s exhibits D, E].)
In view of the aforementioned evidence and the fact that claimant’s expert, Robert DeRosa, did not directly challenge same, the court concludes that the training Zawislak received on sexual relationships between officers and inmates was sufficient and cannot serve as a basis for liability on the part of the defendant.
Supervision: Rules and Policy
As noted, the third-floor dorm housed a much smaller inmate population than the other three floors with dorms. The women housed in the honor dorm were chosen through a process governed by a written procedure and criteria applied by a committee comprised of the deputy superintendent for programs, a captain, a sergeant and the senior housing counselor (defendant’s exhibit U at 1).
Mr. DeRosa, at time of trial, associate director for security and risk manager at Manhattan College, explained that he had served 26 years with the New York City Department of Correction, starting as a correction officer and completing his service as chief of compliance management and special services. In the intervening years, he had been a captain, deputy warden of the Rose M. Singer Center (a 1,500 bed female detention facility), and warden of three city corrections facilities.
*671 DeRosa criticized the roundsman’s free-ranging assignment:
“The ability to go through this building with keys, drawer keys from areas that are secure — the rule is security in jails is if it has a lock, lock it and if it’s not occupied, I expect that door is locked and the last officer there is the person who secured it so therefore I don’t really want a roundsman going through those areas again unless he finds something suspicious.”
DeRosa stated in response to a question on whether DOCS[3] operations at Bayview were contrary to recognized principles or standards: “[F]or hours, based on the testimony and the documents I’ve read, the officer’s not present, he’s been reassigned or she’s been reassigned to other duties off the unit so now those prisoners are unsupervised.” He testified that “when you have prisoners unsupervised it’s just a lot of things that can happen.” But as DeRosa conceded on cross-examination, he did not review any DOCS policies or Bayview policies:
“Q. And is there a direct policy that Bayview facility failed to abide by in their supervision of the inmates at that facility?
“A. I don’t have any direct policy.”
Mr. DeRosa testified that there should have been cameras positioned on the dormitory corridors so that supervisory staff could see who was entering the rooms. The only cameras Bay-view had at the time were mounted by the street-level entrance. DeRosa could point to no rule or standard on cameras, and he agreed that the requirement for them in the City of New York was pursuant to a federal consent decree.
Claimant further contended that the contingent nature of the security coverage on the honor dorm violated the rules of the State Commission of Correction, which provides that “[a]ctive supervision” shall be maintained in all facility housing areas (9 NYCRR 7003.3 [a]). However, by its terms, part 7003 applies to local correctional facilities, not state prisons (7003.1). In response, claimant pointed to Sanchez v State of New York (99 NY2d 247, 251 n 2 [2002]), in which the Court of Appeals noted that although the Commission’s rules “apply to county jails and penitentiaries, not state prisons, the [claimant’s] expert concluded that they are relevant in establishing a reasonable standard of supervision, and they are thus also relevant to our *672 foreseeability analysis [as to an inmate-on-inmate assault].” With that said, while the expert the Court of Appeals referred to in Sanchez was Robert DeRosa, Mr. DeRosa in his testimony here did not cite the Commission’s standards; the issue arose during the cross-examination of defendant’s expert.
Moreover, even assuming that 9 NYCRR part 7003’s definition of active supervision could apply to state facilities, its application would still be uncertain. The part defines active supervision to include: (1) the uninterrupted ability to communicate orally with the inmate; (2) the conducting of supervisory visits at 30-minute intervals; (3) the ability to respond immediately to emergency situations and; (4) the continuous occupation of a security post within a housing area. Item (4) contains qualifying language that the staffing of the security post shall be for a housing area with more than 20 inmates,[4] which was not the case for Bayview’s honor dorm.
Defendant called as an expert Martin Horn, a professor at John Jay College of Criminal Justice, who had been a superintendent of a state correctional facility, Executive Assistant to the DOCS Commissioner, Secretary of Corrections for Pennsylvania, Correction Commissioner for the City of New York and a commissioner on accreditation for the American Correctional Association.
Mr. Horn testified that having the third floor covered by a contingency post rather than a fixed post was appropriate.[5] The purpose is to provide for a more efficient utilization of staff. This is a small unit, the kind of dorm “reserved for low security inmates with a high degree of maturity and responsibility,” and as noted earlier, this particular unit is classified as minimum security. And further, “[i]t is intended to provide individual inmates with an opportunity to experiment with [a] greater degree of freedom, to give them a great likelihood of success upon release, to allow them to be self-governing and self-directing.”
In view of the foregoing, the court concludes that the rules and policies then extant at Bayview cannot, per se, serve as a basis for liability on the part of the defendant.
*673 Supervision: Zawislak and Perez
As for the actual supervision involving Zawislak and Perez, specific knowledge by the defendant is not required. Rather, if it can be shown that defendant reasonably should have known of the relationship, liability will obtain — a standard with which defendant’s expert concurred.[6]
There were some inconsistencies in the testimony, but certain basic elements went essentially unchallenged. Zawislak first had sex with Perez in the late summer of 1999 in the C stairway off the third floor. [7] He had directed Perez to clean the stairs, without, he testified, any immediate ulterior motive.
Until they were caught on March 10, 2001, the two had had sexual relations at least 20 times, some 15 times in Perez’s room in her bed, but also in another stairway, the gym, the rooftop and the officer’s station on the third floor. Moreover, Zawislak testified that “[w]ell we had been kissing regularly before the first time we engaged in anything, and things got hot and heavy, and that’s how it happened.”
Zawislak stated that as of April 1999, “Well we cared very much for each other before that. We already had romantic feelings for each other ... [as of] about April of ‘99.” Zawislak testified that he had told Officer Sterling, “could have been July, August of 1999” that he had feelings for Perez, but that they were not having sex. Zawislak recalls that Sterling replied, “be careful.”
Zawislak implied that he and Perez had exchanged notes more than once:
*674 “Q. Did you know that it was wrong to have any sort of personal relationship, intimate relationship, aside from sex, with an inmate?
“A. Romantically you mean? Like — as far as love notes and that kind of thing?
“Q. Yes.
“A. I knew the Department frowned upon it, yeah.
“Q. And you still pursued this avenue?
“A. . . . Yes.”
Zawislak had given Perez a wedding band. This may not have alerted the Bayview staff to anything untoward inasmuch as Perez already had been allowed a “yellow metal wedding band.” (See defendant’s exhibit K, which is the authorization therefor, signed by Perez and two staff members, with the date issued filled in as December 30, 1998.)
Zawislak testified that when he entered the third floor on his roundsman’s duties, he was not required to sign the logbook at the officer’s desk, but Deputy Werbacher testified that the roundsman would have to sign the logbook in the honor unit. In any event, DeRosa conceded that as to having had Zawislak sign the logbook, “I didn’t say it was going to stop it,” although claimant’s expert observed,
“As a roundsman they didn’t seem to know where he was, they relied on the radio, but the logbook is an option [as is radioing in his location to be logged] . . . They didn’t do that, so he was free to roam the building and access areas without any supervision.”
With that said, DeRosa did not refer to any rules, standards or policies that were not adhered to.
Sergeant Sylvester Johnson took the stand at trial, at which time he had nearly 30 years with the Department and had been at Bayview, serving as a sergeant, from 1995 to 2005. He testified that he had no prior knowledge of an inappropriate sexual relationship between the two, and if he had, he would have reported it immediately to his superiors. Sergeant Johnson also stated that it was inappropriate for an officer to just sit and talk with an inmate in her room unless it is security related.
Johnson said he walked through the floor twice a shift, a lieutenant does so once or twice and other walk-throughs would be done at various times during the day by each of the three deputy superintendents (for security, administration and programs). In addition, according to Johnson, the “charge sergeant” might walk through. Sergeant Johnson made this point about the doors to the inmate rooms on the third floor:
*675 “[Ujsually, on the honor floor . . . most doors are open. So when the officer or the roundsman then makes the rounds, normally when he walks down the corridor, he sees that the door is open. If the door is closed for some reason, he would knock on the door and see if anyone would answer, see if anyone’s in the room. If the person didn’t answer, he would normally open up the door.”
As for Ms. Perez, she has a fairly expansive view of what staff knew about the relationship. While there may be an incentive for Zawislak to help Perez recover, inasmuch as an award of money would likely be of benefit to the child they had together, his demeanor was credible and he had pleaded in open court to the same actions.
For her part, claimant was less credible, and while her defensiveness on the stand to the point of belligerence (“but did you not hear what I just said”) may show a spontaneous truth-telling that was not a pat, prepared-for-trial presentation, her testimony in light of all the evidence in this case, coupled with her admission that she lied in her 2009 letter to the federal judge[8] handling the parallel federal civil suit,[9] effectively undercut the credibility of her uncorroborated testimony on whom she told or who otherwise knew or might have known of the relationship. The court will not rely on this testimony.
Avoiding Supervision
Werbacher did not provide much of an analysis as to how the two managed to avoid detection, but did remark on it at his deposition of October 14, 2010, about which he was asked at trial:
“Q. Do you accept that Zawislak avoided being caught by a supervisor making rounds because of luck, or that he was good and quick at what he did?
“A. All of that.”
Werbacher testified that the count of inmates is done at regular times, for uniformity around the State, but that the rounds of supervisors were conducted, “irregularly”; the implication being that the officers being supervised did not know when their superiors would be on site.
*676 Consider Zawislak’s testimony on the issue. It is unclear from all the evidence whether the only time he had sex with Perez in her room was when Zawislak was the contingency officer; Zawislak’s following testimony strongly suggests it was, although, for example, Werbacher’s March 21, 2001 memo to the Inspector General’s office, following the discovery of Zawislak in claimant’s room on March 10, includes the following: “Officer Hill was the unit officer but, due to it being a contingency post, was off the unit at the time” (defendant’s exhibit W).
“Q. Do you recall the number of times you had sex with her in her bed?
“A. At least fifteen.
“Q. When you had sex with her in her bed was there a correction officer on post, at the officer’s station?
“A. No.
“Q. How did you manage to be on the honor floor, during those occasions, to have sex with [the] Claimant?
“A. I was the officer assigned there.”
Zawislak’s testimony continues on the supervision:
“Q. Were there any supervisors checking on you?
“A. They do their rounds and after that, that would be it . . .
“Q. How did you avoid being caught when they went on their rounds?
“A. They just came at different times, and then usually they just showed up once or twice and then that would be it . . . They already signed the logbook and then left, and that was it.”
Perez’s testimony is less suspect on the scheduling of the roof and gym and can be used. She explained that the roof “runs” every hour but if no one showed by quarter past the hour, she and Zawislak had the next 45 minutes. Perez testified that they were able to have (oral) sex in the gym without being caught because, “he’d picked me up or called for me after the inmates would go back to the units.”
What we have here is a striking asymmetry of knowledge. An officer with some three years of experience when this all began knew where eveiyone was — or at least enough to avoid them— and the staff who were supposed to know where he was invariably did not. In fact, the illegal relationship was finally uncovered when, “Sgt. Green went to the floor specifically look *677 ing for Zawislak as he had been calling for him but could not locate him” (defendant’s exhibit W).
Before the sex began, there were examples that Zawislak and Perez had gone beyond the proper officer-inmate interaction. The Employees’ Manual § 7.18, provided, in part, that “Employees shall maintain a quiet, firm demeanor in their contacts with inmates with no undue familiarity or hostility” (claimant’s exhibit 1).
Deputy Superintendent Werbacher’s memo of March 21, 2001 to the Inspector General (IG)[10] provides, “Although Hill could not verify the incident, he did state that Zawislak often visits the unit, talks to the inmate in question (Perez, 97G0760 room 311) and then leaves through the back door” (defendant’s exhibit W). Werbacher testified that such actions by Zawislak violated at least section 2.15 of the Employees’ Manual (claimant’s exhibit 1), which among other things, banned any conversation, association or relationship by an employee with an inmate unless it was part of the employee’s duties, and should have been reported to the supervisor, but as Werbacher said, “obviously he didn’t.”
The primary location for sexual relations was claimant’s room. As Sergeant Johnson testified, if the door were shut, an officer would knock on it to see if anyone would answer and then if there was no answer, open it. We did not hear any testimony that while the two were in Perez’s room with the door closed, only Perez answered and was able to deflect an officer’s inquiry. Testimony was elicited of a number of supervisory staff going through the honor dorm several times a day on a random basis. It seems less than likely that they never came on the floor when the door was shut and the two were behind it.
To this trier of fact, the explanation from Werbacher that Zawislak was “good and quick,” as well as lucky, is not persuasive. This statement naturally leads to the inquiry as to why no one else on the Bayview staff was good and quick from a supervisory vantage. Citing luck as a factor is telling because, given the frequency of the encounters between the two and the unscheduled supervisory tours through the third floor, it sounds *678 as if Werbacher himself has a difficult time finding a valid operational basis for how detection was avoided for so long.
In view of the foregoing, the court finds that claimant satisfies her burden of proof by a fair preponderance of the credible evidence: it was more likely than not that defendant should have known of the sexual relationship between Officer Zawislak and claimant Perez. The Clerk of the Court is directed to enter judgment for 100% liability against defendant State of New York.

. Compare Thompson v State of New York, Ct Cl, Aug. 28, 2007, Ruder-man, J., claim No. 108000, UID No. 2007-010-016, affd 63 AD3d 825 (2d Dept 2009).

. Claimant’s exhibit 7 is a diagram of the third-floor layout showing 13 rooms.

. “DOCS” for Department of Correctional Services; its name was changed by chapter 62 of the Laws of 2011 to the Department of Corrections and Community Supervision, reflecting the assumption of parole functions.

. 9 NYCRR 7003.2 (c) (4).

. Defendant’s exhibit V is the job description for the third-floor contingency post; among the 25 listed duties are to, “[rjespond immediately to all emergency and evacuation procedures.”

.
“Q. In your use of the term foreseeable, do you believe you consider . . . what the Department of Corrections reasonably should have known, as opposed to . . .
“A. [Interposing] What they actually knew.
“Q. Actually knew?
“A. Right, what they reasonably should have known.”

. The testimony differed on when in 1999 the two first had sex. At trial, Zawislak initially said it was August or September of 1999, and then later in his testimony, August. According to his June 25, 2001 statement to the New York County District Attorney, the sexual relationship began in October or November of 1999. Defendant’s exhibit T is Zawislak’s videotaped statement to the District Attorney in 2001; this court ruled it can only be used for impeachment purposes.
Zawislak stated that they had sex 15 times in claimant’s room plus the other locations mentioned, typically once. Perez said when asked about the frequency of sex, “Every time he was on the unit.”

. Claimant’s letter was dated February 14, 2009 and addressed to the Honorable Gabriel W Gorenstein, a United States Magistrate Judge (defendant’s exhibit R).

. Regarding informing the federal judge whether Perez had spoken to her lawyers, “that part I lied about.”

. The DOCS policy statewide was that officers who learned of such activity were to inform the appropriate official, here Werbacher, or the facility superintendent, and the former would put together the information he had and forward it to the IG’s office, which had a sex crimes unit. At trial, we heard from two senior investigators of the IG’s office, Linda Carrington and Faith Watson.